Dr. Clinton C. BATTLE, Plaintiff,

v.

JEFFERSON DAVIS MEMORIAL HOSPITAL et al., Defendants.

Civ. A. No. W74–37(R).

United States District Court, S. D. Mississippi, W. D.

June 2, 1976.

Mark Shenfield, Jackson, Miss., for plaintiff.

Joseph S. Zuccaro, Natchez, Miss., for defendant.

## OPINION

DAN M. RUSSELL, Jr., Chief Judge.

Dr. Clinton C. Battle, a black physician residing in Natchez, Mississippi, brought this action against Jefferson Davis Memorial Hospital, Natchez, a public county hospital in Adams County, Mississippi, and the individual members of its Board of Trustees, seeking staff privileges denied to him by said hospital and its governing board. Jurisdiction is predicated on 28 U.S.C. Section 1343(3) and (4). Plaintiff bases his claim on rights arising out of the Due Process and Equal Protection Clauses of the Fourteenth Amendment, 42 U.S.C. Section 1983, and Title VI of the Civil Rights Act of 1964, 42 U.S.C. Section 2000d et seq.

The cause was tried to the Court without a jury. Facts established by the pleadings or by stipulations and admissions of counsel, or by the record, are adopted by the Court, a resumé of which follows:

Dr. Battle received his Doctor of Medicine (M.D.) degree from Meharry Medical College, Nashville, Tennessee. He interned at Kansas City General Hospital, Kansas City, Missouri, and served residencies at that hospital, as well as at Provident Hospital, Baltimore, Maryland; Lincoln Hospital, Durham, North Carolina; and George W. Hubbard Hospital, Nashville, Tennessee. He has staff privileges at Natchez Charity Hospital, Natchez, where he has full surgical privileges, and at Jefferson County Hospital, Fayette, Mississippi. He is duly licensed to practice medicine in Mississippi and Tennessee.

The defendant hospital is a public, county hospital organized and operated pursuant to state law.[1] It was constructed with federal financial assistance in the form of Hill-Burton grants, and currently admits patients receiving federal Medicare and Medicaid assistance.[2] The hospital, which opened in 1960, operated on a racially segregated basis until its Board of Trustees resolved to comply with the Civil Rights Act of 1964 on

---

1. As such its acts must comport with the provisions of the Fourteenth Amendment, and, "under color of law" is subject to 42 U.S.C. § 1983.

2. The hospital is equally subject to the provisions of 42 U.S.C. § 2000d.

October 24, 1967. There are no black physicians on the staff, although there is a black dentist.

The hospital is governed by a Board of Trustees appointed by the Adams County Board of Supervisors. Two of its seven members were black at the time Dr. Battle's application was unanimously denied by the Board. The parties agree and the Court finds that at all times relevant to this action the hospital and its trustees were acting under color of state law.

Dr. Battle first applied for staff privileges at the hospital on September 20, 1972. Staff privileges entitle a physician to use hospital facilities in the care and treatment of his patients. A physician without staff privileges cannot attend patients in the hospital. Although he may have patients hospitalized, the responsibility for their care and treatment must be transferred to a physician with staff privileges, who then receives all remuneration for the professional services rendered at the hospital.

At the time of plaintiff's initial application for staff privileges, the by-laws of the medical staff of the hospital set forth the following minimum requirements for staff privileges:

1. An M.D. degree from a medical school approved by the American Medical Association.
2. Membership in the Homochitto Valley Medical Society and the Mississippi State Medical Society.
3. A license to practice medicine in Mississippi.
4. Residence and practice in the community.

According to the by-laws, applications for staff privileges are to be submitted to the Hospital Administrator, who is to secure certifications of the references and records submitted by the applicant. The Administrator then presents the application to the Credentials Committee which investigates the applicant's character, qualifications, and standing. The Credentials Committee submits a recommendation to the Executive Committee that the application be accepted, rejected or deferred. This Committee, in turn, recommends classification as to staff privileges in a report to the entire medical staff. A two-thirds (⅔) vote of the medical staff present is required for election to the medical staff. Finally, the decision of the medical staff is transmitted to the Board of Trustees for its ratification. Pending final resolution of the process, the Administrator of the hospital, with the concurrence of the chief of the medical staff and the head of the department involved, is authorized to grant temporary staff privileges to applicants for no longer than six months.

Following Dr. Battle's application of September 20, 1972, the then administrator promptly initiated queries to verify the information supplied by the applicant. On October 9, 1972, the Credentials Committee voted to defer action "solely because of the conflicting opinions expressed about Dr. Battle in his references" (Ex. 19) and referred the matter to the Executive Committee. On October 20, 1972, this committee, following a discussion of the application and a review of the letters of recommendation by then received, recommended by a vote of four to two that plaintiff's application be rejected (Ex. 21). At a November 22, 1972 meeting of the Executive Committee, its minutes reflect that the hospital's Chief of Staff reported that Dr. Battle had verbally withdrawn his application, but had not done so in writing (Ex. 22). Pending confirmation, no action was taken by the medical staff (Ex. 23). Meanwhile the hospital administrator was receiving written information concerning the fact that applicant, in early 1970, while on the staffs of both the Mound Bayou Community Hospital, Inc., and the Coahoma County Hospital, Clarksdale, Mississippi, which is not listed on his application under "membership on other hospital staffs (past and present)", had been involuntarily committed to Mississippi State Hospital at Whitfield, Mississippi and subsequently was released against medical advice to a psychiatrist on the staff of George W. Hubbard Hospital of the Meharry Medical College for psychiatric treatment, and that this psychiatrist had diagnosed plaintiff's condition as a mild chronic paranoid reac-

tion, prone to develop exacerbations under stress, including the stress of habitual drug usage (Ex. 26). On January 4, 1973, the medical staff recommended that plaintiff's application be denied (Ex. 27). This action was ratified by the Board of Trustees on January 22, 1972, and the applicant was so notified on January 23, 1973. (Ex. 28). No reasons for the denial were given in the notice, nor was plaintiff advised of a right to appeal.

As a result of a complaint filed by Dr. Battle charging the hospital with racial discrimination, the regional Chief of Health and Social Services Branch, Office for Civil Rights, of the Department of Health, Education and Welfare, herein called HEW, at Atlanta, Georgia, arranged with the hospital to conduct a routine review of the hospital and to investigate the complaint of Dr. Battle (Ex. 29). In a letter of April 4, 1973, to the hospital administrator, the chief of the aforesaid federal agency reported the results of this investigation, noting that no reasons were given to Dr. Battle for the denial of his application, further noting that the hospital administrator and chief of the medical staff had expressed to the agency that the denial was based on omission of data in plaintiff's application, and the lack of detailed information relative to his past staff privileges at the Coahoma County Hospital, whereas, Dr. Battle had stated that he had written to the Coahoma County Hospital requesting it to submit that information to defendants and that the information was not pertinent to his medical qualifications but related to his personal affairs (Ex. 31). The Court notes that Dr. Battle's letter of December 15, 1972, to the administrator of the Coahoma hospital asked only for a statement that his work had been satisfactory and to confirm that he had resigned from the staff to work full-time in Mound Bayou, Mississippi (Ex. 25). Although a reply from the Coahoma hospital, dated December 19, 1972, to Dr. Battle affirmed that he had staff privileges and had submitted his resignation as of May 11, 1970 (Ex. 25), this apparently was not satisfactory to the defendant hospital in view of its knowledge that the project di-

rector of the Mound Bayou Community Hospital, Inc., where Dr. Battle had been a member of the staff, and had so noted on his application, stated that Dr. Battle had been on the Mound Bayou staff, no dates given, but refused to give him a recommendation (Ex. 15). Nonetheless, in response to the agency chief's request that Dr. Battle's application be re-considered after he was given an opportunity to respond with specific detailed information needed by the hospital regarding his past staff privileges at the Coahoma County Hospital (Ex. 31), the hospital notified plaintiff on April 24, 1973 that, in conformity with the HEW letter of April 4, 1973, it was requesting him to resubmit his application furnishing (1) a list of his privileges on the medical staff of the Coahoma County Hospital with tenure dates; (2) an outline of the specific reasons for his suspension as a member of that medical staff, stating why he did not attend a hearing of the Board of Trustees of Coahoma Hospital on May 7, 1970, and why, on May 11, 1970, he submitted his resignation from the staff of that hospital, and (3) plaintiff's present employment and activities. The letter further requested, in view of the fact that plaintiff had been committed to the Mississippi State Hospital at Whitfield, Mississippi to give the reasons for his admission and the circumstances under which he had been discharged (Ex. 33). In this connection, the agency chief, having been furnished a copy of this letter, wrote to defendant on May 4, 1973, stating that the information requested relating to Dr. Battle's admission to and discharge from the state hospital in 1970 bore no relation to his current qualification for medical staff privileges, and instead the hospital should request Dr. Battle to secure a release of his hospital records from the Mississippi State Hospital, and submit a current assessment of his psychological condition from a qualified psychiatrist (Ex. 35). The hospital complied with this request (Ex. 36).

On October 22, 1973, plaintiff resubmitted his application for staff privileges. He again listed a residency at Duke University Medical Center during the years 1964–1967,

added Coahoma County Hospital as one where he had staff membership, and again claimed to be eligible for American Board certification as a surgeon in July 1969. On October 16, 1973, he was given a psychiatric evaluation by the same practitioner who secured his release in 1970 from the Mississippi State Hospital at Whitfield, and who informed the defendant hospital that plaintiff was "of sound mind, mentally competent and alert, extremely intelligent and certainly capable of practicing medicine and surgery at your hospital." (Ex. 38). At a meeting of the Credentials Committee on November 15, 1973, it was noted that all the information requested of Dr. Battle had not been furnished and his re-application was deferred pending completion (Ex. 39). The Executive Committee, meeting on November 16, 1973, noted that a current psychiatric evaluation had been furnished, but accepted the recommendation of the Credentials Committee that consideration of Dr. Battle's new application be postponed pending receipt of a summary of his hospitalization at Mississippi State Hospital at Whitfield (Ex. 40). On November 29, 1973, Dr. Battle was again requested by the defendant to furnish records pertaining to his stay at the state hospital at Whitfield (Ex. 41). On February 22, 1974, Executive Committee minutes relating specifically to Dr. Battle reflect that the Executive Committee recommended that any licensed M.D. not on the staff of the hospital be permitted to assist another surgeon in the operating room of defendant hospital if consent be first obtained from the Chief of Surgery and Chief of Staff (Ex. 43).

On March 14, 1974, plaintiff's attorney requested the defendants to accept his letter with an attached resumé of Dr. Battle's education and experience as a formal application for Dr. Battle's membership to the medical staff. This resumé includes a chronological account of his education, medical degree, internship, practice, residencies, and staff memberships, omitting the staff privileges previously claimed at Mound Bayou Community Hospital, Inc., Mound Bayou, Mississippi, and Coahoma County Hospital at Clarksdale, during the years 1969–1971 (Ex. 44). On March 19, 1974, the Credentials Committee reviewed plaintiff's renewed application, noting that no new information had been supplied and that the applicant had still failed to furnish the information previously requested relating to his resignation from the Coahoma County Hospital and to his hospitalization in the Mississippi State Hospital. In view of this the committee authorized the hospital administrator to seek written authorization from Dr. Battle for the hospital to secure all information possible concerning applicant's professional activities while on the staff of the Coahoma County Hospital and to seek full particulars from that hospital regarding applicant's resignation from that staff (Ex. 45). The administrator promptly initiated these requests. The committee also noted that plaintiff's claim of a residency at Duke University Medical Center during the years 1964 to 1967 had not been verified (Ex. 45). After successive contacts with Duke University Medical Center, that institution twice again notified the defendant hospital that it had been unable to locate any person of applicant's name who had done any resident surgery there during the years 1964 to 1967, all evidence being to the contrary (Exs. 46 and 53). The Executive Committee, in its minutes of March 22, 1974, noted from the minutes of the March 19, 1974 meeting of the Credentials Committee that that committee had made no recommendations on plaintiff's renewed application pending further investigation (Ex. 48). On March 25, 1974, plaintiff's attorney wrote to the defendant hospital that Dr. Battle had authorized the following statement relating to the termination of his employment at the Coahoma County Hospital: "His employment with the hospital began during the month of July, 1969 and terminated during the month of April 1970. This was a voluntary resignation and he was not under pressure, nor did it involve anything relating to moral turpitude, professional misconduct or incompetency. He does admit that he has been under administrative reprimand for tardiness in completing medical charts, a

fairly common procedure which has on occasion applied to many prominent physicians." (Ex. 49). This letter was accompanied by a medical waiver executed by plaintiff authorizing the defendant hospital to secure from Mississippi State Hospital at Whitfield all of plaintiff's medical records (Ex. 50). Under date of April 22, 1974, these records, consisting of an AMA (against medical advice) discharge note, dated 3/25/70, a consultation note of 3/20/70, and an anamnesis of 3/19/70, were forwarded to defendant (Ex. 52). The discharge note, by a Dr. Bell, recognized that plaintiff at that time was in need of psychiatric treatment, but gave no formal diagnosis as plaintiff was not there long enough for a formal evaluation, having been released to the psychiatrist at George W. Hubbard Hospital, Nashville, as noted above. Inasmuch as defendant hospital has received several psychiatric evaluations of plaintiff's competency in 1973 (Ex. 38) and in 1971 (Exs. 126, 127, 128 and 129), the latter group addressed to hospitals other than defendant and not made available to it until 1974, the Court does not find it necessary to comment on the contents of the Whitfield medical reports other than saying plaintiff's commitment to the hospital at Whitfield was apparently instigated by his wife with whom he was having marital difficulties at the time.

On May 14, 1974, the minutes of the Credentials Committee noted that the hospital had still not received an authorization from plaintiff to secure information from Coahoma Hospital covering plaintiff's conduct and practice in that hospital, nor had the hospital received verification of Dr. Battle's claimed residency at Duke University Medical Center, nor recommendations from either Duke University Hospital or Lincoln Hospital in Durham, North Carolina. The minutes further reflect that the committee, in view of Dr. Battle's file being incomplete, declined to take further action at that time, requesting the administrator to seek Dr. Battle's cooperation in securing a complete file on his professional activities (Ex. 58). The administrator again queried Duke University Medical Center seeking to find if it had affiliated hospitals where Dr.

Battle may have served a residency (Ex. 54); again queried the American College of Surgeons seeking to determine Dr. Battle's board eligibility as claimed (Ex. 55); and queried other references furnished by applicant, including Dr. Charles Watts, Chief of Surgery, Lincoln Hospital, Durham (Exs. 56 and 57).

The full medical staff of defendant hospital also met on May 14, 1974, and declined to act on plaintiff's application in the absence of verification of plaintiff's past medical experience, particularly concern being shown for a full report from Coahoma County Hospital regarding his status at the time of his resignation (Ex. 59).

On May 16, 1974, the defendant hospital's administrator again requested plaintiff's attorney to furnish Dr. Battle's authorization for defendants to contact the Coahoma County Hospital for an evaluation of plaintiff (Ex. 60). On the same day, plaintiff's attorney complained to the hospital attorney that defendants were procrastinating and withholding information from plaintiff's attorney (Ex. 61).

Meanwhile, the Duke University Department of Alumni Affairs informed the defendants that it had no Clinton C. Battle on file (Ex. 62), and the American College of Surgeons, while noting that it did not board certify, indicated that, on September 17, 1969, plaintiff was sent an application to take board examinations, which he did not complete or return (Ex. 63). On May 28, 1974, the American Board of Surgery, Inc., informed the defendants that plaintiff had not been certified by it, nor was he an active candidate for examination by the Board, nor was he currently admissible to the examination (Ex. 68).

Prior to receipt of the above letters, minutes of an Executive Committee meeting on May 24, 1974, reflect that upon the report of the hospital administrator that he had been unable to verify plaintiff's residency at Duke University Medical Center, nor to verify from the Chief of Surgery a residency at the Durham Lincoln Hospital, and that contact with the American Board of

Surgery revealed that plaintiff is not a diplomate of that board nor eligible to take its examinations, the Credentials Committee declined to proceed on plaintiff's application (Ex. 66).

On May 27, 1974, a letter to defendants from the former Chief of Surgery of Lincoln Hospital, Durham, confirmed that plaintiff served as a resident in surgery at that hospital for the years 1966–67 at a time when Lincoln Hospital enjoyed an approved status, further stating that plaintiff was required to attend surgical conferences at Lincoln and Duke Medical Center, and that his work was adequate (Ex. 67). In this connection, a letter dated June 10, 1974, from the Residency Review Committee on Graduate Education in Surgery reflected that the residency training program in surgery at Lincoln Hospital in Durham, North Carolina had been terminated as of December 13, 1963, with credit granted by the American Board of Surgery to residents serving through June 30, 1964, and that no residency program had been in existence since that time unless it had become a part of another program (Ex. 73).

On June 18, 1974, the Credentials Committee met for the specific purpose of reviewing the file of plaintiff. After reviewing his credentials, the committee unanimously rejected the application on the following grounds:

1. Apparent discrepancies in Dr. Battle's application listing a residency at Duke from 1964–1967 whereas the Duke Medical Center has no record of such a residency being served; and applicant's claim that he is a Board eligible surgeon which is refuted by the American Board of Surgery.

2. Dr. Battle's questionable psychiatric status as per information provided to the committee by the Mississippi State Hospital in Whitfield, Mississippi.

3. The committee's lack of authorization from Dr. Battle to contact Coahoma County Hospital with specific respect to the underlying reasons for Dr. Battle's resignation from the Medical staff of that hospital. (Ex. 74)

On June 21, 1974, the Executive Committee reviewed the action of the Credentials Committee and approved it by a unanimous vote (Ex. 75). On June 24, 1974, plaintiff was notified of the action of the Executive Committee and advised of his right, provided for in the by-laws of the defendant's medical staff, to a hearing before an ad hoc committee of the medical staff (Ex. 76). On July 1, 1974, plaintiff's attorney requested such a hearing and requested that the proceedings be recorded (Ex. 77). On July 2, 1974, the medical staff rejected plaintiff's application by a vote of 34 to 0 (Ex. 78). On July 5, 1974, plaintiff was notified that an ad hoc committee had been appointed, with Dr. Philip Bayon as chairman, to review his case, with the hearing set at 5:30 p. m., July 26, 1974, at the hospital (Ex. 79). On July 17 and 19, 1974, plaintiff was again advised of his right to appeal, furnished pertinent portions of the hospital's by-laws, advised that the proceedings would be recorded, and that he could have counsel present who would not be permitted to interrogate or cross-examine witnesses.[3] (Exs. 85 and 86). Prior to the hearing, plaintiff's attorney associated counsel from the Jackson, Mississippi chapter of the American Civil Liberties Union, who, on Dr. Battle's behalf, requested copies of all communications and documents relevant to the three grounds asserted as the basis for the rejection of plaintiff's application, a list of all witnesses who would testify against plaintiff with a summary of their expected testimony, and a two weeks' continuance after the receipt thereof (Ex. 87). No response was made to this letter.

On July 22, 1974, the chief of the HEW agency, notified the defendant hospital of the results of its investigation of racial charges as to bed occupancy, and of Dr. Battle's complaint. As to the latter, the

---

3. This requirement was modified at the hearing and plaintiff's counsel was allowed full participation.

agency determined that a comparison of files on 53 physicians reflected that the hospital had applied different criteria in processing Dr. Battle's application from that applied to five Caucasian applicants, e. g., when unable to verify internships, residencies, etc., the hospital took no follow-up actions, nor restricted their staff privileges in any way. The agency recommended that the hospital grant staff privileges to Dr. Battle in accordance with his training and the processing of applications for Caucasian physicians with similar qualifications and credentials (Ex. 88). The Court notes that of the physicians' charts attached to the agency's letter on which it relied for its recommendation, one is missing, and the other four apply to physicians who sought staff privileges in 1960, four years before the passage of Title VI of the Civil Rights Act of 1964, and seven years before the defendant hospital adopted its present method of processing applications. The Court will later herein comment on the hospital's earnest endeavor in 1968 to bring up to date all such information as to physicians remaining on its staff.

In response to the agency letter the hospital replied by sending the agency its current patient pre-admission form on which no reference is made to the patient's race and re-stating the hospital's prior resolution of compliance with the Civil Rights Act of 1964. This letter further stated that appropriate committees of the hospital had attempted to apply the same review process for applicants for staff privileges and would continue to do so (Ex. 89).

The ad hoc committee hearing on a review of Dr. Battle's case proceeded on July 26, 1974, as scheduled. A transcript of this hearing is a part of this record (Ex. 131), containing 131 pages and the entire hospital file consisting of 102 pages, as exhibits, copies of most of which in turn have become exhibits in the case sub judice. The Court has carefully reviewed this transcript and all of the exhibits thereto. With respect to the hearing, all five members of the ad hoc committee were present, as well as the administrator of the hospital, a physician spokesman for the Credentials Com-

mittee, the hospital counsel, Dr. Battle, his attorney and a court reporter. At the outset plaintiff's attorney was assured of full participation and he did freely participate. A copy of the rejection of plaintiff's application as reflected in the June 18, 1974 minutes of the Credential Committee was read. It was also noted that the Executive Committee, the medical staff and the governing body of the hospital had concurred in the rejection. Because of the several applications submitted by Dr. Battle, it was noted that a large file on Dr. Battle had resulted. From then on each ground for rejection was considered, with documents both favorable to plaintiff and unfavorable, all made a part of that record, with plaintiff and his attorney given every opportunity to defend or explain.

As to plaintiff's claim on his application that he had a residency at Duke University Medical Center from 1964–1967 plaintiff conceded that his residency was actually at Lincoln Hospital, where at that time black residents were trained, and which he thought was affiliated with Duke, which he admitted also had black resident physicians in training. He frankly admitted he listed Duke because of the prestige of its staff. As to his board certification, Dr. Battle explained that he had not claimed he was certified, but only eligible for certification in July 1969. This was eventually determined by the defendant's correspondence with the American College of Surgeons who notified defendants that Dr. Battle was eligible in July 1969 to apply for the examinations for board certification. The American Board of Surgery wrote that he had not taken the examinations and was no longer eligible. Dr. Battle agreed to retract any insinuation that he was still eligible for board certification.

As to plaintiff's psychiatric status, the committee reviewed both the records from the Mississippi state hospital as well as the subsequent favorable evaluations stating that plaintiff was competent and free of any psychiatric disorder. As to the Whitfield's psychiatrist's admission report indicating the habitual use of drugs, Dr. Battle

denied that he was a user of drugs then, or at the time of his ad hoc committee hearing (Tr. p. 74).

As to the third area of inquiry, that of the circumstances of Dr. Battle's resignation from the Coahoma County Hospital, which the Credentials Committee thought the most important, the Ad Hoc Committee had before it copies of three documents, none furnished by plaintiff, the first being a copy of a resolution of the Coahoma County Hospital Board of Trustees, meeting on December 31, 1969, when that board temporarily suspended the staff privileges of Dr. Battle, having formed a judgment that "since any delay in the temporary suspension of Dr. Battle's staff privileges may endanger the health or welfare of hospital patients, the said temporary suspension shall become effective immediately". (Tr. pp. 13 and 14). The second document was a copy of a second resolution by this same board referring to the first, noting that Dr. Battle was informed in writing of the temporary suspension, that he had requested a hearing before the board, that such a hearing was set for April 29, 1970, attended by Dr. Battle and two attorneys, that at that hearing Dr. Battle's attorneys requested and received a postponement to May 7, 1970, and that on May 11, 1970, Dr. Battle submitted his resignation from the staff of the Coahoma County Hospital, which was accepted by the Board of Trustees. The third document was a copy of Dr. Battle's letter of resignation. All three documents are exhibits to the transcript of the hearing before the Ad Hoc Committee. (Ex. 131).

In his defense Dr. Battle said he was given no reason for his temporary suspension and that the only reason he could think of was his dilatoriness in completing medical charts (Tr. p. 65). When asked if he thought it strange that the Board of Trustees of Coahoma County Hospital would meet on a New Year's Eve to consider the status of his medical charts, his reply was evasive (Tr. p. 68). In answer to the direct question would he authorize the release from the Coahoma County Hospital of the underlying reasons for his temporary suspension and resignation, this question was ultimately answered by plaintiff's attorney who said that the release would be forthcoming only upon the hospital's agreement to turn over to plaintiff's counsel all information in its possession, both favorable and unfavorable (Tr. p. 104), being the same position plaintiff's counsel had taken in a letter to the hospital on May 22, 1974 (Ex. 64). Members of the ad hoc committee also undertook to question Dr. Battle on his reasons for filing a complaint with the HEW agency for racial discrimination when race had not been injected into any part of the consideration given to his application (Tr. pp. 84 to 103). This discussion culminated with adding as an exhibit to the transcript an HEW letter, dated June 22, 1974, to Dr. Battle to the effect that HEW's investigation of his complaint showed that the hospital had applied different criteria than that used for Caucasian physicians, and that the defendant hospital had been requested to take corrective action. This is the determination referred to above, to which the defendant hospital responded. The hearing eventually recessed pending a mutual exchange of information requested by the hospital from plaintiff, that is, a release from plaintiff to the hospital relative to the suspension and resignation of plaintiff from the Coahoma County Hospital, and the furnishing to plaintiff of all information the hospital had relative to plaintiff's application (Tr. p. 106).

The Ad Hoc Committee hearing reconvened on September 17, 1974 with the same parties present. It was determined at this time that the defendants had turned over to plaintiff's counsel all information in the possession of the hospital relative to Dr. Battle's application (Tr. p. 108). Plaintiff's counsel, nonetheless, still refused to furnish defendants with a release in order for the defendant hospital to acquire the desired information from Coahoma County General, a refusal concurred in by plaintiff (Tr. pp. 108 and 109). Defendant's counsel stated that the Coahoma County General had refused to furnish such information in the absence of a release from plaintiff. Thereupon, the ad hoc committee members were

polled, and unanimously upheld the decision of the Credential Committee to deny plaintiff's application (Tr. pp. 113 to 115), its action being evidenced by order of October 10, 1974 (Ex. 108). This action was affirmed by the Executive Committee (Exs. 105 and 110).

In a case of this kind, the Court's function, after a review of the transcript of the hospital hearing afforded to Dr. Battle is (1) to determine if he was afforded a fair hearing comporting with due process of law, (2) to determine if the denial of his application was racially motivated, (3) to determine if the rejection was arbitrary, irrational or based on grounds unrelated to his professional qualifications, and (4) due to the injection into the case of HEW's determination that the intensity of the hospital's investigation of references and credentials exceeded similar checks made as to the references and credentials of Caucasian applicants, (Exs. 94, 115 and 117) a position plaintiff had adopted in his post trial brief, the consideration, if any, the Court is bound to give thereto.

As shown above, the defendants, in their processing of plaintiff's application, meticulously followed the step-by-step procedures set out in the hospital's by-laws. Although a copy of these by-laws is the only item this Court knows of that was not introduced into evidence, the parties obviously found it unnecessary to do so in view of their stipulation that the prescribed procedures were followed, and to which plaintiff has made no post-trial objection. Upon the denial of plaintiff's last application, re-submitted on October 22, 1973 and March 14, 1974, by the full medical staff, plaintiff was timely notified of his right to appeal this decision before an ad hoc committee, again in conformity with the by-laws, and he and his attorney were allowed to participate fully in an extensive recorded hearing, including the right to examine all information pertaining to applicant in the hospital's files, and including the right to present evidence on his behalf. The Court is mindful of the decision in *Sosa v. Board of Managers of Val Verde Memorial Hospital*, 437 F.2d 173 (5th Cir.), wherein the Appellate Court found that the fact that a doctor, as plaintiff here, met the minimum requirements of the by-laws of the hospital which required an applicant for staff status be a graduate of an approved medical school, legally licensed to practice in the state, and practicing in the community, does not confer an unconditional right to hospital privileges. Further in the opinion it was stated:

" . . . This court has recently indicated that staff appointments may be constitutionally refused if the refusal is based upon 'any reasonable basis, such as the professional and ethical qualifications of the physicians or the common good of the public and the Hospital,' *Foster v. Mobile County Hospital Board*, supra [5 Cir.], 398 F.2d [227] at 230. Admittedly, standards such as 'character qualifications and standing' are very general, but this court recognizes that in the area of personal fitness for medical staff privileges precise standards are difficult if not impossible to articulate. *North Broward Hospital District v. Mizell*, supra. The subjectives of selection simply cannot be minutely codified. The governing board of a hospital must therefore be given great latitude in prescribing the necessary qualifications for potential applicants. *Foster v. Mobile County Hospital Board*, supra; *North Broward Hospital District v. Mizell*, supra [Fla., 148 So.2d 1]; *Sussman v. Overlook Hospital Association*, supra [95 N.J.Super. 418, 231 A.2d 389]. Contra, *Milford v. People's Community Hospital Authority*, 1968, 380 Mich. 49, 155 N.W.2d 835. So long as the hearing process gives notice of the particular charges of incompetency and ethical fallibilities, we need not exact a précis of the standard in codified form.

(5) On the other hand, it is clear that in exercising its broad discretion the board must refuse staff applicants only for those matters which are reasonably related to the operation of the hospital. Arbitrariness and false standards are to be eschewed. Moreover, procedural due process must be afforded the applicant so that he may explain or show to be untrue

those matters which might lead the board to reject his application. *Foster v. Mobile County Hospital Board,* supra; *Meredith v. Allen County War Memorial Hospital Commission,* supra [6 Cir., 397 F.2d 33]; *Citta v. Delaware Valley Hospital,* E.D. Pa.1970, 313 F.Supp. 301.

(6) In the instant case there was considerable evidence regarding Dr. Sosa's ethical and professional competency. No court should substitute its evaluation of such matters for that of the Hospital Board. It is the Board, not the court, which is charged with the responsibility of providing a competent staff of doctors. The Board has chosen to rely on the advice of its Medical Staff, and the court cannot surrogate for the Staff in executing this responsibility. Human lives are at stake, and the governing board must be given discretion in its selection so that it can have confidence in the competence and moral commitment of its staff. The evaluation of professional proficiency of doctors is best left to the specialized expertise of their peers, subject only to limited judicial surveillance. The court is charged with the narrow responsibility of assuring that the qualifications imposed by the Board are reasonably related to the operation of the hospital and fairly administered. In short, so long as staff selections are administered with fairness, geared by a rationale compatible with hospital responsibility, and unencumbered with irrelevant considerations, a court should not interfere. Courts must not attempt to take on the escutcheon of Caduceus."

■ Under this Court's interpretation of the quoted language, Dr. Battle received a due process hearing. As to the hearing itself, the following language from *Woodbury v. McKinnon,* 447 F.2d 839 (5th Cir.) is particularly apt:

"A reading of the transcript of the hearing fails to indicate any bias against the plaintiff by the medical staff. To the contrary, the hearing transcript reveals that the hearing was held in a decorous manner with a high degree of professionalism."

Quoting from plaintiff's counsel on page 103 of the transcript: ". . . I've practiced law for twenty-five years and I've never been before a Court that I thought was conducted any fairer than you've conducted this hearing."

To paraphrase other language from Woodbury, supra, the record of this case is devoid of any inference that considerations other than medical competence were involved; there is not the slightest suggestion shown by the facts that the hospital action was for any reason other than the concern of the authorities for the standard of medical practice and the welfare of the hospital patients.

The various committees' concern, particularly relating to plaintiff's refusal to release information from Coahoma County Hospital to defendants, was directed toward learning whether his temporary suspension and resulting resignation were due to professional inadequacies or for unrelated reasons. At this point in time not only was his professional competency in doubt, but also his credibility. Also, the hospital defendants could not have been more cooperative or helpful in trying to verify the residencies, board eligibility, and previous staff positions claimed by plaintiff in his application or omitted therefrom; e. g. the omission in his first application of his staff status at Coahoma County Hospital, and his ultimate inclusion of it, as evidenced by the plethora of correspondence directed to the Duke University Medical Center and the American Board of Surgery in an effort to substantiate his claims.

■ Whether or not the Court agrees with the hospital's final decision to deny plaintiff's application, as stated in Sosa, no court should substitute its evaluation of plaintiff's professional competency for that of the hospital board and its committee. Accordingly, this Court cannot say that their decision was arbitrary, irrational or based on grounds unrelated to plaintiff's professional qualifications.

The Court has been troubled by the findings and recommendations of HEW in its correspondence with the hospital in the light of language appearing in Circuit

Judge Sobeloff's decision in *Cypress v. Newport News General & Nonsectarian Hospital Ass'n*, 4 Cir., 375 F.2d 648, wherein he held, with respect to a hospital operated on public funds, that the equal protection clause of the Fourteenth Amendment requires that the same standards, whether high or low, be applied equally to all. In that case he held that negro applicants for medical staff membership made out a prima facie case of racial discrimination when the facts showed there were no negro physicians on the staff of a large metropolitan hospital, and when patients were assigned to rooms on a discriminatory basis. Here, too, although all the exhibits were agreed to as to authenticity, plaintiff offered into evidence, over defendants' objection the correspondence between the defendant hospital and HEW, obviously not only to show a prima facie case of racial discrimination, but in order to adopt the agency's claim of a disparate treatment accorded to plaintiff's application when compared to that accorded other applicants.

In view of this, the Court has reviewed the hospital's responses to HEW (Exs. 98, 114 and 118), and the applications of 47 doctors (Exs. 132 to 178, inclusive), to each of which are attached letters from the defendant hospital attempting to verify information supplied in the applications, such as the place and time of medical licenses, narcotic registry permit numbers, medical schools, internships, residencies, and previous staff positions. These dossiers were evidently compiled by the agency or by the hospital for the agency from hospital records. Of this number at least 27 pertain to applications made in 1960, two in 1961, two in 1963, one in 1964, three in 1965, two in 1966, one in 1967, five in 1968, one in 1970, and two in 1972. As to the applications dating from 1967 back to 1960, very little verifying data is shown in the year of the application. From most, if not all, verifications were sought in 1968. The obvious conclusion to be drawn from this is that the hospital opened in 1960 and from that date until October 1967 when the hospital resolved to comply with the Civil Rights Act of 1964, verifying data was either not requested, was misplaced or destroyed.

Hence the effort by a zealous administrator in 1968 to bring the records up to date, and he so said in his inquiries. According to the charts (Ex. 88), prepared by the agency, and from which it said there were five Caucasian doctors whose credentials were not verified, the Court finds that the dates of applications of only four of these doctors appear in the HEW charts, and of the four remaining, all were members of the original 1960 staff who made applications in 1960. The Court therefore finds no significance in this comparison as claimed by the HEW agency. Of the five applications made in 1968, verifying information was sought in all five, resulting in three temporary appointments to staff status, pending verification. In the 1970 application, temporary status was given pending verification. As to the two 1972 applicants (Exs. 138 and 155), who supposedly were granted staff status, no inquiries or confirmations accompany them. However, the Court attaches little, if any significance to this fact. To infer that their qualifications were not checked, orally or in writing, is entirely too speculative in view of the defendants' established method of verifying credentials in all other instances. HEW's analysis is entirely too literal, and in some instances, erroneous, to be applicable to the defendants' professional duty to seek only doctors for their staff who are professionally competent.

As may be surmised from the number of exhibits in this case, little live testimony was offered by either litigant.

Plaintiff called as an adverse witness, William J. Mitchell, the current Executive Director of the defendant hospital, whose title has been used throughout this opinion synonymously with the title of administrator. He made it clear that there was no hospital requirement that plaintiff have served a residency at Duke Medical Center. The issue was that plaintiff claimed he served such a residency which the hospital was unable to verify.

Plaintiff's only other witness was a statistician who identified a compilation he had made with reference to defendant hospital's patient bed assignments. The only apparent purpose of this testimony was to claim

racial discrimination in support of plaintiff's claim of racial discrimination, which the Court has earlier found did not exist in relation to the treatment accorded plaintiff's application.

Of defendant's two witnesses, one was Dr. L. W. Nelson, chairman of the Board of Trustees of the defendant hospital. He is one of two black trustees, all of whom are appointed by the board of supervisors of Adams County. Dr. Nelson joined in the unanimous vote of the Board of Trustees to adopt the determination of the Credentials and Executive Committees, and the unanimous vote of the entire medical staff to reject plaintiff's application. He stated that every effort had been made to integrate all facilities offered by the defendant hospital, and he testified at length regarding the recruiting efforts of the hospital to obtain black doctors on its staff.

Mr. Mitchell, recalled as defendants' witness, stated that every department of the hospital was integrated but one which was coincidental. He too described his recruitment efforts to obtain qualified black doctors for the staff. As to plaintiff's application, which was pending when Mitchell began his employment with Jefferson Davis Memorial Hospital, Mitchell said he processed it in the same manner as all others. No narcotics registry permit number is required for every doctor, but it is preferable for each to be on the registry as the hospital's pharmacy cannot release narcotics on the orders of doctors who are not registered. Plaintiff was properly registered with a currently active permit, and there was no problem concerning it. He was particularly concerned with being unable to verify plaintiff's claimed residency at Duke University Medical Center, the status of his eligibility for board certification, but most concerned over the circumstances surrounding plaintiff's suspension and resignation from the Coahoma County Hospital which would not release this information in the absence of a waiver from plaintiff, which plaintiff refused to give.

In conclusion this Court finds that plaintiff with respect to his hospital hearing was afforded due process of law. The rejection of his application was not racially motivated, nor was the decision arbitrary or irrational. As to any intensity in the hospital's attempt to verify the facts claimed by plaintiff or omitted from his application, the Court finds that this was disparate treatment only in the respect that it was brought about by plaintiff himself in erroneously claiming credentials which he did not have, and refusing to divulge the circumstances of his suspension and resignation from a hospital which he failed originally to list as one where he had enjoyed staff status.

The Court is not presently aware if any surgical privileges have been extended to Dr. Battle to assist in surgery at the defendant hospital with the consent of the Chief of Surgery and the Chief of Staff, as the hospital once agreed to do. The Court will not order defendants to do so, but suggests that if this courtesy has not been extended that the defendants do so under such supervision as the Chief of Surgery and Chief of Staff find necessary.

The Court directs that plaintiff's suit against all defendants be dismissed with court costs assessed to the plaintiff.