160 So.2d 608 (1964)
Upton W. GILES, Jr., M.D., Plaintiff-Appellee,
v.
Wilbert F. BREAUX et al., Defendants-Appellants.
No. 6086.
Court of Appeal of Louisiana, First Circuit.
January 16, 1964.
*609 Watson, Blanche, Wilson, Posner & Thibaut, by Robert L. Roland, Baton Rouge, for appellants.
Pittman & Matheny, by Tom H. Matheny, Hammond, Robert A. Anderson, Covington, for appellee.
Before ELLIS, LOTTINGER, HERGET, LANDRY and REID, JJ.
ELLIS, Judge.
The defendants have appealed from a judgment in favor of the plaintiff commanding them to admit Dr. Upton W. Giles, M.D., to active staff membership in the St. Tammany Parish Hospital, Covington, Louisiana, subject to whatever limitations were placed on him by virtue of a surgical check list recommended by the credentials committee and the medical staff of the hospital on December 14, 1962.
We have carefully considered the entire record in this matter, the briefs of all counsel, and the written reasons for judgment by the District Judge and find said reasons are full and complete, are supported by the record *610 and cover all arguments made orally or in brief by counsel necessary to a decision of the case and, therefore, quote said reasons, with approval, as the judgment of this Court, except as they may be specifically augmented, altered, or amplified hereinafter by this Court:
"This is a suit brought by Dr. Upton W. Giles, Jr., against the Board of Commissioners of the St. Tammany Parish Hospital Service District, asking that the Board be enjoined with interfering with him in the exercise of medical staff privileges at St. Tammany Parish Hospital, Covington, Louisiana, and asking that the Board be ordered to admit Dr. Giles to medical staff privileges in accordance with the recommendation of the active medical staff of the said hospital.
"Before going into the issues presented by the case, it is necessary that the following background information be set forth:
"The St. Tammany Parish Hospital Service District was created by Act 129 of 1950. Shortly thereafter, the St. Tammany Parish Hospital was constructed in Covington, Louisiana. A number of years later, an additional hospital was constructed in Slidell, Louisiana, and at that time, Act 116 of 1958 was adopted. The effect of Act 116 was to increase the size of the Board of Commissioners of the Hospital Service District, and the two acts contain all of the law pertaining to the said district. As set forth therein, the Board is composed as follows:
"`Section 3. The hospital created under the provisions of this Act and any other hospitals that are formed or created within the Parish of St. Tammany, State of Louisiana, shall be governed by a Board of eleven (11) Commissioners, and hereinafter referred to as `Commission,' who shall be qualified voters and residents of the Parish. The members of the Commission shall be appointed by the St. Tammany Parish Police Jury, one member from each Ward and one member Parish-wide. The present members of the Commission shall serve out their terms and their successors shall be appointed for terms of six (6) years in such a manner that each Ward of the Parish shall have representation on the Commission. The eleventh member, who shall be the Chairman, may be appointed from any Ward in the Parish. The six new members to be appointed in order to bring the membership of the Commission to the number herein set, shall be appointed, two (2) members for a period of two years, two (2) members for a period of four years and two (2) members for a period of six years. At the expiration of their respective terms of office, the successors of such appointees shall be appointed within thirty days to six (6) year terms. The Police Jury shall fill vacancies in the same manner as the precedessor appointees were selected. The members of the Commission shall not receive per diem or other compensation for services rendered as Commissioners.'
"The powers and duties of the Board which are pertinent to this case are as follows:
"`Section 5. In addition to the duties defined elsewhere in this Act, the Commission shall have the duty and authority:
"`(1) To represent the public interest in providing hospital and medical care in the parish.
"`(2) To advise the Police Jury and the hospital director of problems concerning the operation of the hospital and other facilities.
"`(3) To make, alter, amend and promulgate rules and regulations governing the conduct of the hospital.
"`(4) To conduct hearings and pass upon complaints by or against any officer or employee of the district.

*611 "`(5) To review and modify, or set aside any action of the officers or employees of the parish which the Commission may determine to be desirable or necessary in the public interest.
"`(6) To appoint, with the approval of the medical staff, a director of the hospital and to perform such other duties as may now or hereafter be required by law.
"`(7) To appoint the necessary standing and special committees which may be necessary to carry out the purpose of this Act.
"`(8) To establish rates of pay for the use of facilities provided by the district.
"`(9) To enter into lease agreements with recognized and duly constituted non-profit associations, which are primarily engaged in the operation of hospitals.'
"`Section 8. The Commission shall appoint a medical staff. Such appointments shall be made upon the recommendations of the physicians who are authorized to practice within the hospital.'
"`Section 11. The Commission shall have the power, and it shall be their duty to adopt rules and regulations for the proper conduct and operation of the hospital or medical facilities under its administration.'
"At the initial meeting of the eleven man board on September 16, 1958, the chairman appointed two five men operating committees, one for each hospital in the parish, to act on `every day problems' of the hospitals.
"On August 16, 1962, the following resolution was adopted by the full Board of Commissioners:
"`Whereas, from the time of the construction of the Slidell Memorial Hospital, it has been the policy of the Board of Commissioners that, although the entire Parish of St. Tammany was covered by one Hospital Service District, the hospitals in Slidell and Covington were to be considered separate and distinct entities and were to be managed according to that principle, and
"`Whereas, in order to carry out the above principle, each hospital has its own Operating Committee consisting of five members of the Board of Commissioners, and
"`Whereas, the Board of Commissioners of the St. Tammany Parish Hospital Service District deems it proper to formally define the foregoing principle of separate management, now, therefore,
"`BE it resolved, that the Operating Committee of the Slidell Memorial Hospital, and the Operating Committee of the St. Tammany Parish Hospital be, and they hereby are, authorized and empowered to perform all of the administrative and operative functions pertaining to the respective hospitals under their care, reports of their respective actions to be rendered to the full Board of Commissioners at the Board's quarterly meetings.'
"The effect of this resolution was to turn over the full authority for the conduct of all affairs of the Covington and Slidell Hospitals to their respective Operating Committees.
"Although authorized to do so, neither the Board nor the Operating Committee has ever adopted any regulations or rules for the conduct of the affairs of the hospital. The record does reveal that the medical staff has adopted by-laws, rules and regulations, and that, insofar as they are applicable, they are binding on both the medical staff and the Board. Article III of the by-laws of the medical staff provides in part as follows:
"`Section 1. QualificationsThe applicant for membership on the medical staff shall be a graduate of an *612 approved medical school, legally licensed to practice medicine or dentistry in the State of Louisiana, practicing in the community or within reasonable distance of the hospital, and qualified to meet specifications as stated in Article IV.'
"`Section 4.Terms of Appointment
"`Subsection 1. Appointments shall be made by the governing body of the hospital after recommendations of the Medical Staff and shall be for the balance of the calendar year for which the appointment is made.
"`Subsection 2. Appointment to the Medical Staff shall confer on the appointee only such privileges as may hereinafter be provided.
"`Section 5. Procedure for Appointment.
"`Subsection 1. Application for membership on the Medical Staff shall be presented in writing and shall state the qualifications and references of the applicant and shall also signify his agreement to abide by the By-laws and Rules and Regulations of the Medical Staff. The application for membership on the Medical Staff shall be presented to the Administrator of the hospital, who shall verify by correspondence all statements made by the applicant concerning training and experience, and present it to the secretary of the Medical Staff.
"`Subsection 2. All proposed recommendations for new and reappointments shall be submitted by the Credentials Committee to the Medical Staff for approval at a regular Medical Staff Meeting. Where a recommendation to defer is made, it must be followed by a recommendation to accept or reject the applicant at the next meeting of the Medical Staff. All pending applications should be reported on at each regular monthly Staff meeting.
"`Subsection 3. On receipt of the report of the Credentials Committee, the Medical Staff shall immediately recommend to the governing body that the application be accepted, deferred, or rejected; and if accepted, shall recommend the privileges to be granted.
"`Subsection 4. The recommendation of the Medical Staff shall be transmitted to the governing body of the hospital through the administrator.
"`Subsection 5. The governing body shall either accept the recommendation of the Medical Staff at its next regular meeting, or shall refer it back for further consideration stating the reasons for such action.
"`Subsection 6. When final action has been taken by the governing body, the administrator of the Hospital shall be authorized to transmit this decision to the candidate for membership and, if he is accepted, to secure his signed agreement to be governed by these By-laws, Rules and Regulations.
"`Section 6. Appeals
"`Subsection 1. In any case where the Credentials Committee does not recommend for re-appointment or the Executive Committee does not recommend re-appointment, or where reduction or limitation of privileges is recommended, and the Staff has acted in accordance with such recommendation, the Administrator shall notify the physician concerned, and he shall be given an opportunity of appearing before the Credentials Committee and Joint Conference Committee in Joint session.
"`Subsection 2. After a hearing as outlined above, the Executive Committee *613 shall make final recommendation to the governing board in writing.
"`Section 7. Procedure for Revoking Hospital Privileges.
"`The Executive Committee and the past president of the Medical Staff and the Executive Committee of the governing board will meet for purpose of investigating and acting upon the unethical practice of medicine by any member of the Staff. The member being investigated will be allowed to be heard in full committee with any counsel he should desire. A 2/3 vote of full committee will be necessary for any action.'
"The following chain of circumstances which pertain to this case particularly are also relevant:
"Dr. Giles has been a member of the active medical staff of St. Tammany Parish Hospital since 1956. In accordance with the medical staff by-laws, quoted above, the Credentials Committee met and voted to approve Dr. Giles' application for renewal of his staff privileges subject to certain limitations on his surgical practice, which are represented by a `check list' which was attached to his application. On December 14, 1962, the medical staff, at its regular meeting, voted unanimously to approve the various applications placed before them, including that of Dr. Giles, subject to a surgical check list appended thereto.
"The five man Operating Committee of the hospital met on December 17, 1962, and at that meeting voted to deny the application of Dr. Giles for staff privileges. On December 20, 1962, Wilbert F. Breaux, Director of St. Tammany Parish Hospital, advised Dr. Giles by letter of the decision of the Operating Committee. He was advised that he could admit no patients to the hospital subsequent to December 31, 1962. No reason for the action was set forth in the letter.
"This suit was filed on December 31, 1962, and on that date a temporary restraining order issued, which had the effect of continuing Dr. Giles in his staff privileges pending a hearing on the matter. The case was originally set for hearing on January 4, 1963, but was continued from that date by consent of all parties, and the restraining order remained in force by stipulation.
"On January 9, 1963, the full Board of Commissioners met and acted on the application of Dr. Giles. It was once again denied. The record does not reveal that any notice of this action by the full Board was ever sent to Dr. Giles.
"The issues presented by this case are as follows:
"First, does the Operating Committee have the authority to take definitive action on applications for staff membership? It is the position of the plaintiff that the act creating the Board vests it with the authority to appoint the medical staff, and that it has no right to delegate this authority to any committee.
"Second, in view of the language of the first paragraph of Section 8 of Act 129 of 1950, would either the Board or the Operating Committee have the right to reject the recommendation of the medical staff relative to appointments to the staff? The plaintiff claims that the Board has no discretion in this situation.
"Third, was the act of the Committee and the Board in denying staff privileges to Dr. Giles arbitrary, capricious, and discriminatory?
"The matters presented for decision in this case have been most thoroughly briefed and argued by counsel for both sides. In addition, the Court has reviewed similar statutes from other thirty other states. I believe that it is safe to point out that there has never been a decision by any appellate court in Louisiana involving either the special St. Tammany Parish Act or the general act relative to Hospital service districts [Act No. 420 of 1950], which was *614 adopted the same year as the St. Tammany Parish act. The two acts were almost identical in content. All of the out of state authorities which were cited to the court by counsel involved interpretations of statutes which are entirely dissimilar to that which was adopted by the Louisiana State Legislature. It is, therefore, necessary to consider the statute in this case purely on the basis of the criteria for statutory interpretation prescribed by the legislature.
"R.S. 1:3 provides as follows:
"`Words and phrases shall be read with their context and shall be construed according to the common and approved usage of the language. Technical words and phrases, and such others as may have acquired a peculiar and appropriate meaning in the law, shall be construed and understood according to such peculiar and appropriate meaning.
"`The word "shall" is mandatory and the word "may" is permissive.'
"R.S. 1:4 provides as follows:
"`When the wording of a Section is clear and free of ambiguity, the letter of it shall not be disregarded under the pretext of pursuing its spirit.'
"In addition to the above statutory provisions, The Courts of this state have adopted the rule that all parts of the statute must be construed together and such constructions should be such as to give effect to the entire statute, reconciling the apparently conflicting parts thereof where ever possible.
"It has also been held by the courts of the state that matters expressly provided for do not fall within the scope of general provisions.
"With the above in mind, an examination of Act 129 of 1950, as amended, and particularly the various sections quoted above in this opinion, make it clear that the power to appoint a medical staff rests with the Commission. Although it has the right to appoint committees to carry out various purposes of the act, it cannot be said that it has the authority to delegate completely the responsibilities bestowed on it by the legislature. There can be no doubt that the appointment of the Operating Committee which was made in 1958 to take care of the `every day affairs' of the hospital is a desirable administrative device which will tend to improve administrative procedures within the hospital. However, a delegation of the responsibilities specifically granted to the Commission by the legislature, with no responsibility being retained by the Board is a clear violation of the terms of the statute.
"I therefore hold that the Board of Commissioners acted beyond its authority in delegating such powers to the Operating Committee, and that the Operating Committee was without authority to act on the application of Dr. Giles.
"However, the defendants claim that the above question was rendered moot by the action of the full Board taken on January 9, 1963. This, of course, was over a week after the suit was instituted. Pretermitting the question of the propriety of the consideration of action taken by the Board subsequent to the institution of this suit, it becomes necessary to consider what authority the Board does have. Insofar as relevant to this case, the authority is as set forth in Sections 5, 8 and 11, of Act 129 of 1950 which are hereinabove quoted in this opinion. A general perusal of the statute, with particular attention to those sections would appear to make it obvious that the legislature intended that the commission be the governing body of the hospital. It was granted th power to adopt rules and regulations governing the conduct and operation of the hospital; it has the right to conduct hearings and pass upon complaints by or against any officer or employee of the district; and to review and modify or set aside any action of the officers or employees of the parish which *615 the commission may determine to be desirable or necessary in the public interest. The only limitation placed upon the general authority of the commission is that contained in the second sentence of the first paragraph of Section 8. That paragraph provides:
"`The Commission shall appoint a medical staff. Such appointments shall be made upon the recommendations of the physicians who are authorized to practice within the hospital.'
There can be no doubt that this paragraph places upon the Commission the mandatory obligation to appoint any physician recommended for appointment by the medical staff.
"However, this fact cannot change the inherent authority of the Board to suspend or revoke staff privileges of any physician who fails to comply with the rules and regulations of the hospital or whose professional qualifications are such as to render him not competent. This authority can only be exercised within the framework of the rules and regulations set up for the governing of the hospital. It is unfortunate that the Board has never set up such rules and regulations. The only regulations pertaining to revocation of staff privileges are those contained in the by-laws of the medical staff. These by-laws are taken almost verbatim from the Hospital Accreditation References, put out by the American Hospital Association, 1961 Revision. This volume was offered in evidence. However, they do not contain any provisions relative to the procedures to be followed in the event that a revocation of staff privileges is under consideration, other than Section 7, hereinabove quoted. This section of the medical staff by-laws is impossible to utilize since it would appear that no executive committee has ever been set up by the full Board. In any event, none of the above procedures have been followed.
"I might point out that none of the other state statutes which were examined by the Court have a provision even remotely similar to that contained in the first paragraph of Section 8. Louisiana is alone among those states in granting by law to the medical staff of the hospital some voice in the conduct of its internal administrative affairs."
At this point we interrupt the quotation of the reasons for judgment in order to augment the lower court's opinion with specific reference to the provision "in the second sentence of the first paragraph of Section 8," supra. We agree with the lower court that the first paragraph of Section 8 quoted above is mandatory, yet subject to the inherent authority of the Board to suspend or revoke the staff privileges of any physician who fails to comply with the rules and regulations of the hospital or whose professional qualifications or actions are such as to render him not competent. However, we are further of the opinion the Commission not only has the inherent authority to suspend or revoke staff privileges for just cause but could also refuse re-appointment for the same reason. Whether it be to suspend or revoke staff privileges already granted to a physician or by way of refusal of re-appointment, we agree with the lower court that such authority should be exercised within the "framework of rules and regulations set up for the governing of the hospital." Had the Commission complied with the law set forth in Section 5(3), (7), and specifically Section 11, all quoted, supra, there would have existed not only an orderly procedure governing a suspension, revocation or refusal to re-appoint to staff privileges any physician for cause, but additionally this law suit might have been avoided had such duties been recognized and executed by the Commission and followed as set forth in the Hospital Accreditation References by the American Hospital Association, Chicago, Illinois, as contained in the 1961 Revision introduced in evidence herein, and which contains the basic principle which must be followed in order for a hospital to be accredited by the Joint Commission on Accreditation of Hospitals as *616 shown on page x, et seq. of said booklet and also particularly those recommendations set forth in Chapter 11, page 12 under the heading "GOVERNING BODY AND ADMINISTRATION," under which we find the following:
"A. Governing Body
"The governing body is legally and morally responsible for the conduct of the hospital. In the discharge of its duties, it placed the responsibility for the medical care of the patient in the hospital primarily upon the medical staff. For effective performance the governing body should do the following:
"1. Adopt bylaws in accordance with legal requirements.
"2. Meet at regular stated intervals.
"3. Appoint committees. There should be an executive committee and others as indicated for special purposes.
"4. Establish a formal means of liaison with the medical staff, preferably by a joint conference committee.
"5. Appoint members of the medical staff.
"6. Appoint a qualified hospital administrator who is the official representative of the governing body. The administrator is responsible for the conduct of the hospital, and provides liaison among the governing body, the medical staff, the nursing staff, and other departments of the hospital.
"7. Provide a physical plant equipped and staffed to maintain the needed facilities and services for patients."
The purpose of following the seven recommendations above in order to effectively perform the legal and moral duty vested upon the governing body is clearly shown on page 13 of this pamphlet under the heading, "STATEMENT ON THE JOINT CONFERENCE COMMITTEE":
"The Standards for Hospital Accreditation of the Joint Commission on Accreditation of Hospitals state that the governing body of a hospital should establish a formal means of liaison with the medical staff. Although the method used to accomplish this is a decision to be made locally, the Commission considers the establishment of a Joint Conference Committee a preferable plan. The Board of Trustees of the American Medical Association and the American Hospital Association have approved the following statement which should be of help in the formation of such a committee:
"PREAMBLE
"As the art and science of medicine have become more complex and more comprehensive, hospital services, of necessary, have followed suit in an effort to produce maximum results from medical progress. For this reason and because of the other joint and separate responsibilities which physicians and hospitals have in providing medical care and hospital services, organization and cooperation are essential.
"These responsibilities cannot be discharged with maximum effectiveness without proper laison between doctor and hospital, the doctor being represented in an organized manner by a medical staff and the hospital by its governing body and that body's designated representative, the administrator.
"In addition to, but not in conflict, with regularly established lines of authority and responsibility, there should be a common ground where these two groups can meet in order that there may be mutual understanding of each other's activities and problems. A suitable medium for this interchange of information and discussion is the Joint Conference Committee.

*617 "This document seeks to encourage the development and to strengthen the role of the Joint Conference Committee of the Board of Trustees and medical staff. It urges the establishment of such Joint Conference Committees because it believes that they will bring to bear on major decisions which must be made in the hospital a full measure of broad experience, intelligence and responsibility.
"Such a Committee should be a part of the organizational structure of every hospital. It should exist even where there is medical staff representation on the governing board. The representatives of this committee meetnot as representatives of the departments from which they were chosenbut as members of the committee as a whole in the interest of the patient, the physician, the hospital and the community."
Had this matter been thrashed out before the proper committees and in the proper way it would probably have been settled within the walls of the hospital rather than the walls of the court room.
Returning now to the able written opinion of the lower court, we quote:
"In view of the extreme notoriety achieved by this case, the court feels that it is necessary to comment on the testimony which was elicited during the trial. With the exception of some technical procedural matters, all of the testimony received was intended to show that the action of the Operating Committee and the Board in denying Dr. Giles staff privileges was not arbitrary, capricious or discriminatory. The Court does not feel that it would serve any purpose to review in detail the mass of testimony which was heard. However, the Court feels that it must point out that in all of the testimony heard, not one of the physicians who testified was able to point at one example of malpractice of medical incompetence on the part of Dr. Giles. In every case, the physicians were testifying from hospital charts and records, without ever having seen Dr. Giles' own records or the patients in question. Therefore, their testimony could be considered in no light other than a criticism for the record keeping practices followed by the doctor. In view of the testimony of Dr. Kety concerning the quality of the records and charts kept at St. Tammany Parish Hospital, it would appear that Dr. Giles is not alone as a transgressor in this respect. It is clear from the testimony that no effort has been made to enforce the keeping of adequate records and charts until very recently, and that even as of the date of the trial the standards maintained were not as high as should be required by proper medical procedure.
"However, at the time that the decision of the Operating Committee and of the Board was made, none of the testimony which was heard in Court was available to either body. The only things which were considered were the following:
"1. An undated letter from the Air Force.
"2. A letter from the Department of Health Education and Welfare, dated November 2, 1962, concerning the drug Reticulose.
"3. A letter to Dr. Ronald A. Hardey from the Director of Charity Hospital, dated December 1, 1961.
"4. A letter from Dr. M. J. Duplantis to Charity Hospital, dated April 8, 1958.
"5. Reply letter to Dr. M. J. Duplantis from the Assistant Director of Charity Hospital, dated May 5, 1958.
"6. A report, mostly concerned with Dr. Giles, written by Dr. Albert J. Sullivan.
"Letters 3 and 4 are merely routine correspondence. Letter 2 deals with a drug which has now been withdrawn from the market, but which, the testimony reveals, was used by most doctors in the treatment *618 of infectious mononucleosis while it was on the market.
"Letter 1 deals with the reasons for the termination of Dr. Giles' residency at Charity, and reveals that Charity Hospital certified that he had satisfactorily performed his duties as a resident at that institution. It was suggested that Dr. Giles be asked his reasons for terminating his residency.
"Letter 5 is a review of Dr. Giles' record while a resident in urology, and reveals that although some of his work was below average, that he received his certificates for work completed by him.
"Dr. Sullivan's report, though it purports to be a survey of conditions at the hospital, is devoted almost entirely to a criticism of five records or charts concerning cases admitted to the hospital by Dr. Giles. These were the same cases testified to by Dr. Sullivan on the witness stand during the trial of the case. These were also the same five cases considered by the Executive Committee of the medical staff in December, 1961.
"Accepting his report at face value, it can be considered as nothing more than a severe criticism of the charts kept by Dr. Giles. The Executive Committee of the Medical Staff apparently felt the same way, since it recommended a suspension of Dr. Giles' privileges unless his records improved. The testimony is clear that his records and charts improved to the point where no penalty was imposed.
"In taking the action which they did, without granting to Dr. Giles any notice, or opportunity for a hearing, and in attempting to hold him responsible for a higher standard of professional behavior than has been required of the other physicians on the staff of the the hospital, the Operating Committee and the Board acted in an arbitrary, capricious, and discriminatory manner. It may very well be that this decision would not be the same had an adequate system of rules and regulations been enforced, or had the medical staff of the hospital policed itself and required of its members the highest standards of performance of their medical duties in the hospital. However, this is not the situation in St. Tammany Parish Hospital. Neither the medical staff nor the Board of Commissioners has fulfilled its responsibilities to the public. The obvious failure of the Board of Commissioners and the medical staff of St. Tammany Parish to work together for the betterment of conditions existing at the hospital demonstrates that they have lost sight of the ultimate purpose of having the hospital at all: the welfare of the patients who use its facilities.
"Accordingly, there will be judgment herein in favor of Upton W. Giles, and against the defendants making peremptory the writ of mandamus issued herein, and ordering the Board of Commissioners of the St. Tammany Parish Hospital District to admit Dr. Giles to active staff membership at St. Tammany Parish Hospital, Covington, Louisiana, subject to whatever limitations were placed on him by virtue of the surgical check list recommended by the Credentials Committee and the medical staff of said hospital."
For the written reasons of the lower court, which we have quoted, and the amplification or augmentation thereof by this court, the judgment of the lower court is affirmed.
Affirmed.