Dr. Edwin G. HYDE

v.

**JEFFERSON PARISH HOSPITAL DISTRICT NO. 2 and the East Jefferson Hospital Board.**

Civ. A. No. 78–750.

United States District Court, E. D. Louisiana.

Jan. 23, 1981.

Phillip A. Wittman and John M. Landis Stone, Pigman, Wlather, Wittman and Hutchinson, New Orleans, La., for plaintiff.

Lucas J. Giordano, Mmahat, Gagliano, Duffy & Giordano, Metairie, La., for defendants.

MITCHELL, District Judge.

This matter was tried to the Court on a former date. The Court now makes the following written findings of fact and conclusions of law in accordance with Rule 52(a) of the Federal Rules of Civil Procedure.

## FINDINGS OF FACT

### I.

Plaintiff, Dr. Edwin G. Hyde, is a medical doctor, licensed to practice by the State of Louisiana. Dr. Hyde is board certified in anesthesiology and is engaged in the practice of that specialty, primarily doing obstetric work at Lakeside Hospital in Metairie, Louisiana.

### II.

Defendant Jefferson Parish Hospital District No. 2 (hereinafter the District) is a political subdivision of the State of Louisiana, created by the Jefferson Parish Council in accordance with the provisions of La. R.S. 46:1051 et seq. The District owns East Jefferson General Hospital (hereinafter East Jefferson) which was constructed with public monies. The Jefferson Parish Council is the governing authority of the District and has delegated its responsibility to operate East Jefferson to a twelve man Board of Directors (hereinafter the Board) which has the ultimate responsibility for the quality of medical care provided by the hospital. The Board appoints an executive director to carry out its policies in the daily operations of the hospital. Mose Ellis has been employed as the Executive Director of the hospital since January, 1968 which was prior to the hospital's construction.

### III.

The by-laws of East Jefferson Hospital provide for the appointment of a separate body, the Medical Staff, which consists of the heads of various medical departments in the hospital. The Medical Staff develops its own set of rules and by-laws, which are subject to ratification by the Board.

Physicians applying for medical staff privileges must submit an application to the hospital director. The accuracy of the information given is checked by hospital employees and the application is then forwarded to the Credentials Committee of the Medical Staff for review of the applicant's qualifications. That Committee then makes a recommendation to the Medical Executive Committee which in turn makes a recommendation to the Board of Directors.

Pursuant to the by-laws of the hospital and the medical staff the Board makes the ultimate determination with regard to the appointments of physicians to the medical staff with the limitation that it must make its choices from physicians who receive recommendations from the medical staff.

## IV.

East Jefferson entered into a contract with Roux & Associates, a professional medical corporation, to provide anesthesia services to the hospital prior to its opening in February, 1971. The contract provided that the anesthesia services would be exclusively provided by Roux and Associates and that members of the group would not provide its services elsewhere without the written authorization of the hospital. The Board felt that a closed group policy was in the best interest of quality patient care. Ellis testified that it was determined that a closed system would be more advantageous because anesthesiology is a hospital based specialty and the Board was of the opinion that the responsibility for the development and management of the department should be placed upon one individual with legal obligations to the institution. Other reasons given for choosing that system were that the supervision of some twenty nurses and the monitoring of specialized equipment could best be handled by one individual or group always present at the hospital. The hospital felt it necessary to have a group on call for twenty-four hours a day so that it could be assured of the presence of a physician in the event of an emergency arising. The closed system would also facilitate the scheduling of operations and result in a more efficient use of operating rooms since there would be no delay while waiting for outside anesthesiologists to arrive. The Board also felt a closed system would allow them to closely monitor the medical standards employed by the members of their department. The medical staff was well satisfied with the system under Roux and Associates and the Board wished to continue under the same conditions. Ellis stated that a patient was free to go to another hospital if he desired to use a particular anesthesiologist who is not on East Jefferson's staff.

## V.

The hospital entered into a second contract with Roux and Associates in January 1976. At Dr. Roux's request the language designating the contract as an exclusive one was omitted. However, in another section, the contract continued to provide that all anesthesia services at the hospital were to be provided by the Roux group. Ellis stated that at no time did the Board express an intent to change its policy with regard to the closed system. Ellis had no firsthand knowledge of the Roux doctors practicing elsewhere though he had heard rumors that such was occurring. Ellis stated that doctors who are not on the East Jefferson medical staff could apply for temporary privileges to practice on a case by case basis.

## VI.

Ellis testified that the hospital charges patients one fee for the professional services rendered by the anesthesiologist and for the anesthesia services provided by the hospital. The hospital pays the salaries of the nurses and purchases the equipment and supplies for the anesthesia department. A large number of the supplies are purchased from out of state. It also provides housekeeping, record keeping and maintenance services to the department.

The anesthesiologist determines the fee for the anesthesia service provided dependent upon the complexity and length of the operation performed. The hospital deducts 8% for bad debts, charity and other write offs from the gross receipts of the department and 50% of the remainder is paid to Roux and Associates for its professional services. Ellis testified that it was in accord with hospital industry practice to pay hospital based specialists a certain percentage of the receipts. Ellis also testified that the anesthesiology department generally made a profit but that the purpose of the closed anesthesiology department was to provide quality patient care and not for the financial profit of the hospital.

Ellis testified that anesthesia services were often paid in part by federal medicare and medicaid benefits.

## VII.

Dr. Kermit Roux formed Roux and Associates in 1970 and began work at East Jef-

ferson in 1971. Roux testified that he requested the omission of the exclusive language in his 1976 contract because he believes a surgeon or patient is entitled to the services of the anesthesiologist of his choice. He admitted that he and others in his group did work outside East Jefferson following the 1976 contract but felt he was not in violation of the contract in light of the changes made in it.

Roux testified that he employed three other doctors in his group and that there are usually thirteen or fourteen certified registered nurse anesthesists (CRNA's) on duty during operations. CRNA's are registered nurses with two years training as anesthesists. They are used in every hospital in the New Orleans area because there are more hospitals than anesthesiologists in Louisiana.

Dr. Roux testified that the anesthesiologist prescribes the anesthetic to be given and the equipment to be used. The doctor administers the drugs and remains in the operating room until he is confident the patient is in stable condition. He then goes to another operating room leaving the nurse to monitor the patient. The doctor again checks the patient in the recovery room. In Roux's opinion neither the hospital nor its nurses are engaging in the practice of medicine.

Roux was unaware of any complaints being made about his group's services.

### VIII.

Dr. Edwin Hyde submitted an application for medical staff privileges to the hospital on July 14, 1977. The Credentials Committee approved his credentials and qualifications and referred the application to the Medical Executive Committee which considered his qualifications and forwarded his application to the Board of Directors with a recommendation of approval.

A Board of Directors meeting was held on September 20, 1977 and the minutes reflect there was discussion with regard to the application of Dr. Hyde to the anesthesiology department. It was noted that Hyde would not be a member of the Roux and Associates group and a motion was made to table the application for further study.

A Board meeting was held on October 18, 1977 and the Hyde application was presented for action. The Board denied the application after a discussion with regard to the benefits of an exclusive contract with hospital based specialists and the Board concluded that a closed system was in the best interest of the hospital and quality patient care.

Ellis wrote Dr. Hyde on October 19, 1977 and informed him that he had not been accepted for medical staff membership due to the exclusive nature of the contract between the hospital and Roux and Associates and because there were no openings in the Department of Anesthesia. Ellis stated that in giving the second reason he meant that Dr. Roux had no membership openings in his group.

Dr. Hyde was not told of any right to appeal his decision nor provided with a copy of the hospital's by-laws.

### IX.

Dr. Charles Eckert is an anesthesiologist employed by Roux and Associates. He also did some work at Lakeside Hospital in 1977 and 1978. Eckert wrote a letter of recommendation to East Jefferson on Dr. Hyde's behalf. It is his opinion that a patient should be given the right to choose his anesthesiologist.

Eckert stated that the Roux group had requested that the exclusive language be removed from its contract because the group was being criticized by their peers for acting unethically.

However, other than that criticism, Eckert stated there had been no other problems with the closed anesthesiology department which is a common practice in the majority of hospitals in the area. He believes such a department is advantageous because the same individuals are working together daily as a team and the technicians learn to anticipate the manner in which the

doctors proceed. Eckert also was of the opinion that it provides flexibility in the scheduling of operating rooms because the hospital does not have to postpone activity while waiting for another group to arrive. It is also easier to have one group operate and maintain the equipment used since they are immediately aware of any problems and can have them remedied. Eckert stated that members of his group had used Lakeside's equipment without any difficulty but that it is not as complex as the equipment used at East Jefferson where more difficult surgeries are performed.

Eckert testified that there are one hundred fifty-six anesthesiologists in Louisiana and three hundred forty-five hospitals with operating rooms. He testified that in order to have an anesthesiologist present at every operation, East Jefferson would have to employ more than twelve anesthesiologists on its staff.

### X.

Mrs. Melvaize Tedeschi is the Director of Operating Rooms at East Jefferson Hospital. She stated that the hospital performs approximately 875 operations per month. She testified that there are generally twelve or thirteen operating rooms in use at one time and four anesthesiologists working. Tedeschi is of the opinion that the nurses are well monitored and has heard many compliments given to the Roux group. She is of the further opinion that if there were outside anesthesiology groups working at the hospital it would decrease the flexibility in scheduling of operations. She also pointed out that if an operation was cancelled there might be a waiting period until the next doctor arrives.

### XI.

Dr. John Rourke has been a member of the East Jefferson Board since it was formed. He testified that the Board always assumed that certain departments would be administered by a single group which would develop that department.

Rourke stated that he knew that at one point Touro Hospital had used two separate groups and had experienced problems with competitiveness between those groups. The problems began because the surgeons would generally give priority to one group and he would then have problems dealing with the other group because they felt they were second choice. Touro eventually entered into a contract with one group.

Rourke stated that problems arise because the physicians all want to begin at the same time and also in the absence of a contract there may not be an anesthesiologist available in an emergency situation, thus placing a patient's health at risk.

Rourke stated the Board and staff were pleased with the work of the Roux group and wanted to continue to have a contract with them to guarantee their availability and the best patient care.

Dr. Rourke testified that a patient is paying a medical fee for the expertise of the anesthesiologist in prescribing the drugs used and performing complex procedures. He stated that the nurses merely monitor the patient's progress during the operation and are not making critical medical determinations.

Dr. Rourke stated that East Jefferson is not a charity hospital and the hospital's operating revenues are obtained from the patient's payments for services rendered. It is a public hospital because it was constructed with community funds.

### XII.

Nicholas Gagliano has also been a member of the Board of Directors since the inception of the hospital.

He testified that the Board has had continued input from the medical staff with regard to the merits of the closed system anesthesiology department and that the Board has re-evaluated its policy and has continued to find that the closed system is the best manner to operate to insure the twenty-four hour availability of quality anesthesia services.

He testified that the hospital has informed the Roux group that it is in violation of its contract to practice elsewhere.

## XIII.

Dr. John Andriani has been practicing anesthesiology at Charity Hospital for forty years. He organized the CRNA training program and established the anesthesiology residency at Charity.

Dr. Andriani testified that he is opposed to the closed anesthesiology departments because a patient loses a right to select the anesthesiologist of his choice and also causes competent physicians to lose jobs. He opined the lack of competition within a hospital will discourage the group with the exclusive contract from improving or initiating new techniques and procedures. Andriani also believes that the closed system discourages anesthesiologists from coming to New Orleans and medical students from entering the field because of a lack of positions in this area.

Andriani is also of the opinion that the hospitals are employing CRNA's and improperly charging patient's medical fees for their services. He believes that one anesthesiologist should supervise no more than three and at most four nurses during operations.

## XIV.

Dr. Edwin Hyde practiced anesthesiology in Florida and at Baptist Hospital, New Orleans, for seven years prior to joining the staff at Lakeside Hospital in 1971. He is associated with two other anesthesiologists at Lakeside. However, Lakeside Hospital has an open department and other anesthesiologists regularly practice there. Hyde testified that a booking secretary schedules the Lakeside operations and there is no problem with outside anesthesiologists coming in to work. He stated that similar systems had worked in the Florida hospital where he worked and at Baptist Hospital without any difficulties.

Hyde does not have a contract with Lakeside Hospital. He bills his patients separately and his group employs its own nurses. The hospital has a maintenance contract on the equipment and any problems with it are reported to Hyde since he is the chairman of the Department. Hyde stated that this system operates without any problems.

Hyde stated that he would continue his separate billing procedure at East Jefferson but would only bring his own nurses if he was doing a complex surgery. The majority of his work at Lakeside is obstetrics and he feels he could attract more doctors to his group if he could do different types of surgery at another hospital. He is of the opinion that exclusive contracts discourage anesthesiologists from coming into the area because they limit the openings at hospitals.

## XV.

Jessie Smallwood, executive director of the Bayou River Health Systems presented data showing which hospitals the patients residing in certain zip code areas attend over various time periods. Her information was incomplete because at various times certain hospitals did not participate in the surveys. There is also no information with regard to which patients had surgery.

The data showed that approximately seventy per cent (70%) of the patients who are residents of Jefferson Parish entered hospitals located in the metropolitan New Orleans area other than East Jefferson. Seventy per cent (70%) of the patients entering East Jefferson are residents of East Bank Jefferson Parish. Several hundred patients from out of state were admitted to East Jefferson Hospital in 1978 and 1979.

## XVI.

Based on the evidence presented the Court concludes that the Board of Directors was acting within its statutory authority under state law and the hospital's by-laws in not adopting the medical staff's recommendation and denying Dr. Hyde medical staff privileges.

## XVII.

The Court also finds that the portion of the anesthesia fees retained by the hospital bears a reasonable relationship to the services and materials provided by the hospital in connection with anesthesiology services.

The Court finds that the hospital did not improperly engage in the diagnosis and treatment of patients. The evidence shows that the anesthesia services are provided by the anesthesiologist who prescribes the drugs used and performs all procedures requiring expertise. The CRNA's work under the supervision of the anesthesiologists and their function is to monitor the patients while they are anesthetized.

## XVIII.

The evidence shows that in the operation of its anesthesia department the defendants are involved in activities which have a not insubstantial effect on interstate commerce. These include buying anesthesia medicines and other supplies from out of state, the receipt by patients of federal medicare and medicaid benefits to pay for anesthesia services and the treatment of out of state patients who require anesthesia services.

## XIX.

The evidence presented was that it is a common practice in the health care industry for hospitals to enter into exclusive contracts with physicians who are engaged in certain hospital based specialties, such as anesthesiology, radiology, pathology, etc. to insure the availability of these services to their patients. Generally a patient does not specifically select a certain individual to perform these services, which increases the hospital's responsibility to insure the quality of services it provides.

The evidence presented was that defendants instituted a closed system anesthesiology department because they believed the system resulted in the best quality of patient care. Specifically the system insures twenty-four hour anesthesiology coverage, aids in the control and standardization of procedures and the efficient and less costly operation of the department; it lends flexibility to the scheduling of operations because it is not necessary to accommodate physicians with outside commitments; it permits the physicians, nurses and other technicians in the department to develop a work routine and a proficiency with the

equipment they use in patient treatment; and it increases the Board's ability to monitor the medical standards exercised because there are fewer individuals involved, maintenance of equipment is simplified and equipment breakdowns are minimized by limiting use to one group of physicians.

The Court does not find that the Board's motive in continuing the closed system is purely a pecuniary one. If that was its only motive it could retain a contract with one group continuing its present billing procedure and still allow other anesthesiologists to come in to practice. It appears to the Court that the Board feels that the closed system department is the best to employ to carry out their obligation to the public to offer the highest quality of medical care.

The Court concludes that the benefits discussed above support a finding of reasonableness that justifies the exclusive arrangement between the defendants and Roux and Associates.

## XX.

The provision of anesthesia services is a medical service separate from the other services provided by the hospital. The hospital charges the patient a separate charge for this service.

The geographic area in East Jefferson competes in the New Orleans metropolitan area. Large numbers of patients from Jefferson Parish use the hospitals in Orleans Parish. Seventy per cent (70%) of the patients living in East Bank Jefferson Parish go to hospitals other than East Jefferson. The Court concludes that East Jefferson is competing for business at least with the hospitals located on the East Bank in Orleans Parish.

## XXI.

The evidence presented did not show that East Jefferson had any advantages over any other hospitals in the area because it is a public hospital. Due to that fact (the hospital was built with public funds) however, it is not a charity hospital and its daily

operations are financed by patients' payments for hospital services. There was no evidence presented that East Jefferson was in a position to charge patients higher prices or to impose burdensome terms which could not be exacted in a completely competitive market. There was no evidence that East Jefferson was a dominant economic power in the market in which it competes.

The impact on commerce resulting from the East Jefferson contract is minimal. The contract is restricted in effect to one hospital in an area containing at least twenty others providing the same surgical services. It would be a different situation if Dr. Roux had exclusive contracts in several hospitals in the relevant market. As pointed out by plaintiff, the majority of surgeons have privileges at more than one hospital in the area. They have the option of admitting their patients to another hospital where they can select the anesthesiologist of their choice. Similarly a patient can go to another hospital if he is not satisfied with the physicians available at East Jefferson.

A closed department may enhance competition among the hospitals in the market by increasing the quality of medical care available. It may also serve to benefit competition among anesthesiology groups if the terms of the exclusive contracts are not for unreasonable periods of time. Such a system would serve to encourage anesthesiologists to improve the quality of their services in order to obtain these contracts with hospitals.

The Court concludes that the purpose of the exclusive contract is to enhance patient care and its restraint on competition in the field of anesthesiology is minimal.

## CONCLUSIONS OF LAW

### I.

The Court has jurisdiction over this action pursuant to the provisions of 28 U.S.C. § 1337 and 28 U.S.C. § 1343(3) and pendent jurisdiction over the state law claims.[1] Venue is properly laid in this district.

### II.

■ The Sherman Antitrust Act prohibits every contract, combination or conspiracy which unreasonably restrains trade or commerce among the several states.[2] It encompasses far more than restraints on trade that are motivated by a desire to limit interstate commerce or that have their sole impact on interstate commerce. Wholly local business restraints can produce the effects condemned by the Act as long as the activity is an inseparable element of a larger program dependent for its success upon an activity which affects commerce between the states.[3]

■ Although it may have an effect on the determination of a violation of the Sherman Act, neither the nature of an occupation nor the public service aspect of a professional practice is controlling in determining whether or not the Act initially applies.[4] The payments exchanged for professional services constitute trade or commerce and, if the commerce involved is interstate in character, it is subject to the jurisdiction of the Sherman Act.[5]

■ A substantial effect on interstate commerce to satisfy the Act's jurisdictional requirements has been found in the health care field where the challenged activity has

1. *United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

2. 15 U.S.C. § 1.

3. *Goldfarb v. Virginia State Bar*, 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975); *Gulf Oil Corporation v. Copp Paving Company*, 419 U.S. 186, 95 S.Ct. 392, 42 L.Ed.2d 378 (1975); *United States v. Employing Plasterers Association*, 347 U.S. 186, 74 S.Ct. 452, 98 L.Ed. 618 (1954).

4. *Goldfarb v. Virginia State Bar, supra; National Society of Professional Engineers v. United States*, 435 U.S. 679, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978); Horan and Nord, "Application of the Anti-trust Laws to the Health Care Delivery System", 9 *Cumberland Law Review*, 665 (1979).

5. *Ballard v. Blue Shield of Southern W. Va., Inc.*, 543 F.2d 1075 (CA4–1976).

some effect on the purchase of out-of-state medicines and supplies, the receipt of federal medicare and medicaid benefits and the treatment of out-of-state patients.[6] The evidence presented showed that East Jefferson Hospital made these interstate contacts in the course of the operations of its anesthesia department and the Court finds that these contacts had a not "insubstantial effect" on interstate commerce. Therefore we find jurisdiction under the Sherman Act.

### III.

Plaintiff contends that the defendants have established a "tying arrangement" by tying the purchase of anesthesia services to the provision of hospital surgical facilities and that such agreement is illegal per se. We are of the opinion that the per se rules used in anti-trust cases governing regular commercial activities should not be made automatically applicable to cases involving professional activities. This will be discussed later in the opinion. However, the Court will discuss the elements involved in determining whether or not the tying agreement is illegal per se in the event an appellate court should disagree on this issue, which involves a relatively new area of law.

An agreement by a party to sell one product but only on the condition that the buyer also purchases a different or tied product, or at least agrees that he will not purchase the product from any other supplier, is a tying agreement.[7] Such agreements serve hardly any purpose beyond the suppression of competition. Tying agreements are unreasonable in and of themselves whenever a party has sufficient economic power with respect to the tying product to appreciably restrain free competition in the market for the tied product and a "not insubstantial amount" of interstate commerce is affected.[8] Where a seller has no control or dominance over the tying product so that it does not represent an effective weapon to pressure buyers into taking the tied item, any restraint of trade attributable to such arrangement is insignificant.[9] Indicia of economic power in the market is the ability of the seller to raise prices or to impose burdensome terms on purchasers which could not be exacted in a completely competitive market.[10] Another indication would be the uniqueness of the tying product (surgical procedures) which prevents the competitors from offering an equivalent product or services.[11] A third sign is that a substantial number of purchasers have accepted this agreement and there is no explanation for it other than the economic power of the seller.[12]

A relevant geographic market is the market area in which the seller operates and to which the purchaser can practically turn for supplies.[13] The evidence showed that 70% of the patients from the East Bank of Jefferson Parish go to hospitals in the metropolitan Orleans area other than East Jefferson. The data presented by the New Orleans Area/Bayou River Health System shows large numbers of Jefferson residents go to hospitals in the New Orleans area such as Mercy, Baptist, and Touro Hospitals and Hotel Dieu. Therefore plaintiff must show that East Jefferson dominated

6. *Hospital Building Company v. Trustees of Rex Hospital*, 425 U.S. 738, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976); *Boddicker v. Arizona State Dental Association*, 549 F.2d 626 (CA9–1977); *Zamiri v. William Beaumont Hospital*, 430 F.Supp. 815 (E.D.Mich.1977); *Feminist Women's Health Center, Inc. v. Mohammad*, 415 F.Supp. 1258 (N.D.Fla.1976).

7. *Northern Pacific Railway Company v. United States*, 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958).

8. *Spartan Grain & Mill Company v. Ayers*, 581 F.2d 419 (CA5–1978).

9. *U. S. Steel v. Fortner Enterprises, Inc.*, 429 U.S. 610, 97 S.Ct. 861, 51 L.Ed.2d 80 (1977).

10. id.

11. *Moore v. Jas. H. Mathews & Co.*, 550 F.2d 1207 (CA9–1977).

12. id.

13. *U. S. v. Phillipsburg National Bank & Trust Company*, 399 U.S. 350, 90 S.Ct. 2035, 26 L.Ed.2d 658 (1970).

the market which at least includes the Orleans Parish hospitals which are located on the East Bank. This plaintiff has failed to do. No evidence was presented that East Jefferson imposes any higher prices or imposes any more burdensome terms on its patients than other hospitals in the area. If the use of CRNA's in their anesthesia department is not a favorable procedure, it is one, according to the evidence, which is imposed by all hospitals in the area.

It does not appear from the evidence that the fact that the hospital is a public one gives it any advantage over others in the area other than that it was built with public funds. It is not a charity hospital and patients pay the same fees as they would pay elsewhere. There was no evidence that the surgical procedures available at East Jefferson are not available at other area hospitals or that the others could not provide equivalent services.

Plaintiff dwells heavily on the fact that seventy (70%) per cent of East Jefferson's patients are residents of the East Bank of Jefferson Parish. It is likely that any individual will choose to go to the hospital closest to his home if it is possible to do so for the convenience of the family. Persons living nearer to hospitals in other areas will choose to go to those hospitals if possible. The Court does not find that this factor is proof that East Jefferson is a strong economic power in the market in which it competes.

Based on the above analysis, the Court rejects plaintiff's argument that the agreement involved herein is illegal per se.

IV.

The United States Supreme Court in *Goldfarb v. Virginia State Bar*,[14] rejected the idea of professional occupational exemption from the anti-trust laws but intimated that a different standard should be applied to professional services in a now often cited footnote. The Court stated:

> The fact that a restraint operates upon a profession as distinguished from a business is, of course, relevant in determining whether that particular restraint violates the Sherman Act. It would be unrealistic to view the practice of professions as interchangeable with other business activities, and automatically to apply to the professions anti-trust concepts which originated in other areas. The public service aspect may require that a particular practice, which could be properly viewed as a violation of the Sherman Act in another context, be treated differently.[15]

In light of that footnote the Court and commentators have suggested that the activities of professional groups should be analyzed according to the rule of reason even though the conduct might be considered a per se violation in another context.[16] Relying on the rule of reason, several courts have upheld the use of exclusive contracts in providing certain medical services to hospitals prior to the *Goldfarb* decision.[17]

In post *Goldfarb* cases different types of analysis have been suggested in applying the rule of reason to professions. One Court held that in order to survive a Sher-

---

14. *Goldfarb v. Virginia State Bar, supra*, n.3.

15. Id. at 788–89, Footnote 17.

16. *Boddicker v. Arizona State Dental Association, supra* at note 6; *Veizaga v. National Board for Respiratory Therapy*, 1977—1 Trade Cas. 61, 274 (N.D.Ill.1977); Tyler, "Goldfarb v. Virginia State Bar: The Professions Are Subject to the Sherman Act", 41 *Mo.Law Review*, 1, 11 (1976); "Application of the Antitrust Laws to Anticompetitive Activities by Physicians", 30 *Rutgers Law Review* 991 (1977), see Horan and Nord at note 4.

17. *Datillo v. Tuscon Gen. Hospital*, 23 Ariz. App. 392, 533 P.2d 700 (Ariz.App.1975) (exclusive contract to provide nuclear medicare services); *Letsch v. Northern San Diego County Hospital District*, 55 Cal.Rptr. 118, 246 Cal. App.2d 673 (1963) (closed radiology department held reasonable and lawful); *Blank v. Palo Alto Stanford Hospital Center*, 44 Cal. Rptr. 572 (1965) (exclusive contract with diagnostic x-ray department held reasonable and proper method of operating a department); *Benell v. City of Virginia*, 104 N.W.2d 633 (1960) (closed radiology department was not arbitrary or unreasonable but in furtherance of hospital's duty to operate efficiently and economically); also see *Radiology Prof. Corp. v. Trinidad Area Health*, 577 P.2d 748 (Colo.1978).

man Act challenge "a particular practice of a profession . . . must serve the purpose for which the profession exists, viz, to serve the public. That is, it must contribute directly to improving service to the public. Those which only suppress competition between practitioners will fail to survive the challenge." [18] Other factors to be considered are the motive underlying the challenged restraint, as well as the relative positive and negative effects, the powers of the parties on the market they serve and whether other less restrictive means could be employed to achieve the same desired results.[19]

The Supreme Court in its first post *Goldfarb* decision, *National Society of Professional Engineers v. U. S.*,[20] implied that the inquiry of the Court in applying the rule of reason is not directed toward the justification of the anticompetitive practice, but rather toward determining whether the challenged practice has an anticompetitive effect.

We have noted in our findings of fact that there are many benefits arising from the closed system which result in improved patient care. We do not believe that the motive behind the system is a pecuniary one, as suggested by plaintiff. Any profits made in the department are put back into the hospital. It is not a situation where a certain individual or group is benefiting financially from the system. The motive appears to be to continue a system which has resulted in the operation of a successful department providing excellent health care. An open department would result in a loss of several of the advantages flowing from the system discussed in our fact findings.

▮ We also find that the anticompetitive effect on the practice of anesthesia in the relevant market area is minimal. The East Jefferson group does not enjoy a monopoly nor does it control a substantial share of the provision of services in the relevant area. As far as the Board is concerned the Roux group practice is limited to East Jefferson Hospital. The contract does not prevent Dr. Hyde or any other anesthesiologist from practicing in any hospital other than East Jefferson in the relevant market area. This Court tends to agree with the suggestion of a commentator[21] that "exclusive relationships, such as those between hospitals and certain speciality services, can properly be characterized as enhancing competition by improving a hospital's ability to provide competent health care competitively."

### V.

The Louisiana anti-trust laws provide that every contract in restraint of trade or commerce is illegal.[22] In interpreting its anti-trust laws, the Louisiana courts have looked to the federal jurisprudence for guidance.[23]

▮ We conclude that there has been no unreasonable restraint of trade under the federal laws and that there has been no restraint in violation of the state anti-trust laws.

### VI.

▮ The operation of a public hospital, such as East Jefferson, constitutes state action and is subject to the requirements of the Fourteenth Amendment.[24]

▮ The Fourteenth Amendment requires a public hospital to afford substantive due process to an applicant for admis-

18. *Boddicker v. Arizona Dental Association, supra* at note 6.

19. *Hennessy v. National Collegiate Athletic Assoc.*, 564 F.2d 1136 (CA5–1977).

20. *National Society of Professional Engineers v. U. S., supra* at note 4.

21. See Horan and Nord, *supra* at note 4.

22. La.R.S. 51:122.

23. *Loew's Inc. v. Don George, Inc.*, 110 So.2d 553 (La.1959).

24. *Woodbury v. McKinnon*, 447 F.2d 839 (CA5–1971).

sion to a medical staff.[25] Substantive due process requires the hospital to consider applicants only on grounds that are reasonably related to the purpose of providing adequate medical care.[26] Courts have found that exclusive contracts between a public hospital and some of its staff members to operate a certain specialized facility to the exclusion of other physicians equally qualified are not unreasonable or arbitrary and are justified if their object is to provide proper medical care to surgical patients.[27]

 We conclude that the defendants entered into the exclusive contract with Roux and Associates in order to provide its patients with quality anesthesia services and therefore the requirements of substantive due process have been met.

## VII.

 The requirements of procedural due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property. When protected interests are implicated, the right to some type of hearing is paramount. But the range of interests protected by procedural due process is not infinite.[28] The Fourteenth Amendment's protection of property is intended to secure the interests that a person has already acquired in specific benefits. For a person to have a property interest in a benefit, he clearly must have more than an abstract need or desire for it. He must have a legitimate claim of entitlement to it.[29] Re-

lying on this principle, one court has held that a physician had no right to a due process hearing prior to the hospital denying him the right to use certain hospital facilities and equipment, finding that he had no more than a unilateral expectation to use them.[30]

 The rationale behind providing a physician with the right to a hearing if he has been rejected for medical staff privileges is to give the applicant a chance to explain matters which might have lead the Board to reject him.[31] He is entitled to a hearing to clear his reputation where some stigma is being imposed on him by the state which may prevent him from taking advantage of future employment opportunities.[32] However, where an applicant's rejection has no connexity with his qualifications but rather is based on the state's desire to continue a particular system or operational regulation, his property rights are not infringed upon and he has no right to a hearing.[33]

 We conclude that Dr. Hyde was not denied a property right to which he was legally entitled. It is also relevant to the Court that Dr. Hyde's qualifications were not the basis for the denial of the privileges. The Board was merely acting in conformity with its policy to have a closed system anesthesiology department. Dr. Hyde's reputation and qualifications were not at issue and therefore the underlying rationale for holding a hearing was not

**25.** *Shaw v. The Hospital Authority of Cobb County*, 507 F.2d 625 (CA5–1975), affirmed on rehearing, 614 F.2d 946 (CA5–1980).

**26.** *Sosa v. Board of Managers of Val Verde Memorial Hospital*, 437 F.2d 173 (CA5–1971).

**27.** *Capili v. Shott*, 487 F.Supp. 710 (S.D. West Va.1978), affirmed 620 F.2d 438 (CA4–1979); *Sam's v. Ohio Valley General Hospital*, 413 F.2d 826 (CA4–1969); *Adler v. Montefiore Hospital Association*, 453 Pa. 60, 311 A.2d 634 (1973) cert. denied, 414 U.S. 1131, 94 S.Ct. 870, 38 L.Ed.2d 755 (1974); *Cobb Cty., etc. v. Prince*, 242 Ga. 139, 249 S.E.2d 581 (1978) also see cases cited at n.17, *supra*.

**28.** *Perry v. Sindermanm*, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972).

**29.** *Board of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972).

**30.** *Adler v. Montefiore Hospital Ass'n. of W. Pa.*, 453 Pa. 60, 311 A.2d 634 (1973).

**31.** *Battle v. Jefferson Davis Mem. Hospital*, 451 F.Supp. 1015 (S.D.Miss.1976).

**32.** *Williams v. Barry*, 490 F.Supp. 941 (D.C. Dist. of Col.) (1980).

**33.** *Cook County College Techrs. Union Local 1600 v. Taylor*, 432 F.Supp. 270 (N.D.Ill.1977); *Manion v. Kreml*, 264 N.E.2d 842 (Ill.App. 1970).

present. Accordingly, we conclude that plaintiff was not entitled to such a hearing under the circumstances.

## VII.

Defendant Jefferson Parish Hospital District was created by the Parish of Jefferson pursuant to Chapter 10 of Title 46 of the Louisiana Revised Statutes and, accordingly, the defendants are governed by the provisions of that chapter in operating the hospital.[34] Pursuant to those provisions "the Commission (the Board of Directors) shall appoint a medical staff. Such appointments shall be made upon the recommendations of the physicians who are authorized to practice in the hospital." [35] Plaintiff relies on the case of *Giles v. Breaux* [36] to support his argument that this provision imposes a mandatory duty on the Board of Directors to appoint physicians upon the recommendation of the medical staff.

*Giles*, an intermediate appellate court decision, involved an interpretation of Act No. 129 of 1950, containing the same language as the above cited provision, which was applicable to the St. Tammany Parish Hospital District. The case involved the revocation of staff privileges of a physician and the Court stated that, in its opinion, the language placed on the Commission the mandatory obligation to appoint any physician recommended for staff privileges by the medical staff.

This Court does not feel bound by *Giles* because it involved an interpretation of a different provision of law. We also find that the *Giles* court did not give a reasona-ble interpretation to the language contained in the provision.

■ The Jefferson Parish Council, by ordinance, has made the Board of Directors ultimately responsible for the administration and operation of East Jefferson Hospital.[37] The provisions of the hospital's by-laws [38] and the by-laws of the medical staff [39] provide for the Board making the ultimate determination with regard to the appointment of physicians to the medical staff after the Credentials and Medical Executive Committee have reviewed their qualifications and made a recommendation. We interpret La.R.S. 46:1058 to provide that the Board could not appoint a physician who has not received a favorable recommendation from the medical staff. It does not require the Board to appoint every physician receiving a favorable recommendation. Our interpretation gives the language used in the above provision its common and ordinary meaning in accordance with the rules of statutory construction.[40]

## IX.

■ We hold that the hospital was not involved in the diagnosis or treatment of patients and was not illegally engaging in the unauthorized practice of medicine.[41]

## X.

For the foregoing reasons, let judgment be entered in favor of defendants, Jefferson Parish Hospital District No. 2 and East Jefferson Hospital Board and against plaintiff, Dr. Edwin G. Hyde, dismissing plaintiff's suit at his cost.

---

**34.** La.R.S. 46:1051 et seq.

**35.** La.R.S. 46:1058.

**36.** *Giles v. Breaux*, 160 So.2d 608 (La.App. 1 Cir. 1964).

**37.** See plaintiff's exhibit 2, By-laws of East Jefferson General Hospital.

**38.** Article VI, Section 1 of the East Jefferson By-laws provides upon recommendation by the Credentials Committee and the Executive Committee of the Medical Staff, the Board approves membership on the Medical Staff.

**39.** Article III, Section 3 of the Medical Staff By-laws provide in part: Initial appointments ... to the Medical Staff shall be made by the governing body. The governing body shall act on appointments ... only after there has been a recommendation from the medical staff as provided in the by-laws.

**40.** La.R.S. 1:3 and 1:4.

**41.** *Rush v. City of St. Petersburg*, 205 So.2d 11 (Fla.App.1967).